Lori PATON, a minor under 18, suing by her father, Arthur Paton, and William Gabrielson, Appellants in No. 74–2237,

v.

J. Wallace LA PRADE, Special Agent In Charge, Federal Bureau of Investigation, Newark, New Jersey, et al., Appellants in No. 75–1063.

Nos. 74–2237 and 75–1063.

United States Court of Appeals, Third Circuit.

Argued June 24, 1975.

Decided Oct. 14, 1975.

Melvin L. Wulf, American Civil Liberties Union Federation, New York City, Frank Askin, William J. Bender, Rutgers Constitutional Litigation Clinic, Newark, N. J., for appellants.

Jonathan L. Goldstein, U. S. Atty., Jack C. Keeney, Acting Asst. Atty. Gen.,

Robert L. Keuch, David H. White, Attys., Dept. of Justice, Washington, D. C., for appellees.

Before VAN DUSEN, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Plaintiffs, Lori Paton, a 16 year old student at West Morris Mendham High School, and William Gabrielson, chairman of the school's Social Studies Department, brought this civil action seeking declaratory and injunctive relief and compensatory and punitive damages. Their complaint alleged that the defendants, J. Wallace La Prade, special agent in charge of the Newark FBI office, "John Doe" (now identified as John Patrick Devlin), a special agent attached to the Newark office, and Clarence M. Kelley, director of the FBI, violated plaintiffs' statutory and constitutional rights.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The allegations of the complaint and various papers submitted in connection with defendants' motion for summary judgment reveal the following facts. In early 1973, the Assistant Postmaster General, acting upon a written request by the Acting Director of the FBI, placed a mail cover upon the Socialist Workers Party headquarters in New York City. Each morning the cover was in effect the foreman of delivery would record any information appearing on the exterior of letters addressed to the Socialist Workers Party and forward the information through the New York Postal Inspector to the New York FBI office. According to the foreman, the cover required only a few minutes to complete and did not delay delivery of the letters. He claims that he neither opened nor otherwise obtained information from inside the envelope, contentions disputed by plaintiffs.

In February 1973, Paton was enrolled in a social studies course, "Left-to-Right," which examined the contempo-

rary political spectrum. The course was created by Gabrielson as part of the social studies curriculum and was taught by Frank Salkoff. As part of an assignment for the course, Paton wrote a letter to the Socialist Labor Party seeking information about its policies but inadvertently addressed it to the Socialist Workers Party.

Paton's name and address were ascertained as a result of the mail cover and duly reached the New York FBI office. The information then was forwarded to the Newark FBI office in a memorandum noting only that Paton had been in "contact" with the national office of the Socialist Workers Party without revealing the nature of the contact. The Newark office determined that it lacked any information about Paton and detailed Agent Devlin for further investigation.

Devlin first consulted the local area directories and determined that one Arthur Paton resided at the same address as Lori. He then inquired at the local credit bureau and learned the present and previous addresses of Mr. Paton and his wife, and Mr. Paton's present and previous places of employment.

Devlin's next step was to contact the local Chief of Police, Edward Strait, who informed Devlin that he had no record of any arrests or convictions of any member of the Paton family with the possible exception of a charge of contempt against Mr. Paton for failure to appear in response to a dog summons. Devlin and Strait disagree over the remaining details of their meeting. Devlin testified at deposition that Strait informed him that Lori was a member of the Paton family and already had graduated from high school. Strait testified, however, that he informed Devlin that he knew Arthur Paton but did not know Lori. According to Strait, he suggested that Devlin contact the local high school only when informed of Lori's age but suggested the wrong high school due to her address.

In any event, Devlin proceeded to West Morris Mendham High School, interviewed its principal and vice-principal, and learned the reason for the mailing of the letter. Devlin filed a report of his activities in a memorandum dated May 4, 1973, which concluded:

In view of the fact that the subject is a high school student who apparently contacted the National Office of the SWP in New York for information for one of her courses and, due to the fact that she is not believed to be involved in subversive matters, it is recommended that this case be closed administratively.

The FBI's record of the investigation, on file in the Newark office, consists of four documents recounting each step in the inquiry. In addition, the Newark name index file contains a card on Paton with the filing symbol, "SM-SWP" (Subversive Matter-Socialist Workers Party), which identifies the larger investigation of which the individual inquiry was a part. According to FBI officials, the filing symbol connotes no adverse information.

Immediately after Devlin's departure, the school officials notified Gabrielson of the visit who in turn informed a journalism class publishing a student newspaper. An article about Agent Devlin's visit to the school appeared in the next issue of the paper. The investigation became well known in the school, in the community, and in the country.

On June 13, 1973, counsel for Paton wrote to La Prade requesting the reasons for the FBI investigation and if, as a result, any files had been compiled about Paton. La Prade replied that Paton was "not the subject of an investiga-

tion by the Bureau" and provided no information about any records.

On July 24, 1973, plaintiffs instituted suit in the District of New Jersey. Their complaint alleged that the FBI unconstitutionally had intercepted Paton's letter which resulted in an improper investigation of her and a compilation and maintenance of a file on her. The complaint sought $65,000 in compensatory and punitive damages from La Prade and "John Doe." The complaint also sought certification as a class action. It demanded a declaratory judgment that "the surveillance and interception by the defendants of the lawful correspondence of plaintiffs and all other persons similarly situated with the [Socialist Workers Party][1] and all other lawful political groups violates" 18 U.S.C. § 1702 (1970)[2] and the first and other amendments to the Constitution, and that "the collection, maintenance and storage of information by the defendants about the lawful correspondence of plaintiffs and all other persons similarly situated" was likewise unconstitutional. Injunctive relief prohibiting the FBI from engaging in such activities in the future and directing the FBI to destroy all files concerning Paton also was sought. Plaintiffs demanded a jury trial.

On April 22, 1974, plaintiffs moved for leave to file an amended complaint and name additional party-defendants. The motion sought to add as party-defendants Agent Devlin, identified in the original complaint as "John Doe," and other FBI agents and the postal inspector involved in the investigation. The motion also sought to add two causes of action. The first alleged that La Prade's answer to the letter of Paton's counsel, by concealing information to discourage

---

1. The unamended complaint refers to the "Young Socialist Alliance." We assume the complaint meant to refer to the Socialist Workers Party.

2. 18 U.S.C. § 1702 provides:

Whoever takes any letter, postal card, or package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in

any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

plaintiffs from attempting to enforce their legal rights, violated 18 U.S.C. § 1001 (1970), regulations implementing the Freedom of Information Act, and the common law of New Jersey. Plaintiffs demanded $10 compensatory damages and $10,000 exemplary damages. The second new cause of action alleged that the wrongful conduct of defendants resulted from a conspiracy to deprive Paton of her civil rights in violation of 42 U.S.C. § 1985 (1970).

On January 14, 1974, the district court denied plaintiffs' motion to certify the case as a class action. The court found, as explicated in a later opinion, that plaintiffs' claims were not typical of those of the members of the proposed class. 382 F.Supp. 1118 (D.N.J.1974).

Upon motions by plaintiffs seeking a preliminary injunction and by defendants seeking a summary judgment, the district court ordered that the "Paton FBI file should be removed from the custody of the Government and destroyed." 382 F.Supp. at 1122. The court granted defendants' motion for summary judgment on all other issues on the ground that plaintiffs had suffered no legally cognizable injury. *Id.* at 1121–22. As a result of this ruling, the court found it "unnecessary to address the instant procedural and discovery motions or the substantive question of the legality of the . . . mail cover." *Id.* at 1122.

Plaintiffs appeal the grant of defendants' motion for summary judgment and the denial of their motions to compel further discovery and to amend the complaint. Defendants cross-appeal the order directing expungement of Paton's files. We find merit in both sides' contentions, vacate the judgment of the district court, and remand.

## II. EXPUNGEMENT OF PATON'S FILE

■ We turn first to the appeal of the order of expungement.[3] Plaintiffs contend that defendants lack the adverse interest necessary to appeal since their only objection to expunging the file was a lack of authority which the court's order has remedied. We believe plaintiffs' argument borders on the frivolous. Defendants have contended that their investigation of Paton was lawful and that the retention of the file was appropriate and necessary. The order of expungement adversely affected defendants' interests and therefore is appealable.

■ On the other hand, defendants contend that Paton lacks standing to contest the maintenance of her file because its retention does not cause her injury. Paton has standing only if she has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ." *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Moreover, the harm must not be a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens . . . ." *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■ In the posture of this case, the existence of a legally cognizable injury should be determined from the pleadings which must be taken as true and any undisputed facts in the affidavits. *See Warth v. Seldin, supra,* at 501, 95 S.Ct. 2197. Summary judgment denying standing should be entered only if the allegations of injury are shams and the affidavits raise no genuine issues of fact. *See United States v. SCRAP,* 412 U.S.

3. The district court ordered the file expunged pursuant to Paton's motion for a preliminary injunction. The court, however, gave no indication that it was issuing a preliminary injunction. It made no determination of the necessity of security required by Federal Rule of Civil Procedure 65(c), nor did it make any findings of plaintiffs' probability of success on the merits and irreparable harm, the normal prerequisites for the issuance of preliminary injunctive relief. Indeed, it is difficult to visualize how destruction of documents ever can be preliminary relief.

The district court could have consolidated the hearing on an application for a preliminary injunction with a trial on the merits. Fed.R. Civ.P. 65(a)(2). Again, the court did not do so. We therefore interpret the district court's action as a grant of partial summary judgment in favor of Paton.

669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

■ We believe that Paton has alleged sufficient injury to have standing to seek the expungement of her file. Paton charges that her file possibly could endanger her future educational and employment opportunities. Paton plans to study Chinese and then seek governmental employment. In this event, her file is likely to command attention.[4] While defendants 'maintain that the file contains no information which would affect adversely Paton's chances of finding employment, we do not believe that the record establishes this proposition as a matter of law. Although the FBI does not consider the filing symbol "SM–SWP" (Subversive Material–Socialist Workers Party), as having pejorative connotations, there is no evidence indicating whether the filing designation will be communicated to government agencies, and if so, whether they will understand its correct significance. Moreover, history of a not too distant era has demonstrated that future misuse of a file labeled "Subversive Material" can prove extremely damaging. As the district court aptly observed, "the existence of [the] records may at a later time become a detriment to her." 382 F.Supp. at 1122.

The threat that the file poses is analogous to the dangers inherent in the maintenance of arrest files. In a case challenging the maintenance of arrest records, the plaintiff, as here, "cannot point with mathematical certainty to the exact consequences of his criminal file" but it "[is] clear that he has alleged a 'cognizable legal injury.'" *Menard v. Saxbe*, 162 U.S.App. 284, 498 F.2d 1017,

1023 (1974). The maintenance of such records results in "injuries and dangers" that are "plain enough." *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 478 F.2d 938, 970, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).[5]

Paton's allegations of injury thus differ significantly from those of the plaintiffs in *Laird v. Tatum*, 408 U.S. 1, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972). There the Court held that plaintiffs lacked standing to challenge a system of Army surveillance and intelligence gathering of dissident political groups. In *Laird*, plaintiffs could allege only that the Army surveillance chilled their constitutional freedoms; they could not point to any concrete direct injury resulting from the intelligence gathering. In the instant case, we believe that the threatened injury gives Paton standing to challenge retention of the file. *See Philadelphia Yearly Meeting v. Tate*, 519 F.2d 1335 (3d Cir. 1975).

■ Our conclusion that Paton has standing, of course, does not establish that she is entitled to the relief she seeks. Determination of the propriety of an order directing expungment involves a balancing of interests; the harm caused to an individual by the existence of any records must be weighed against the utility to the Government of their maintenance. *See United States v. Linn*, 513 F.2d 925 (10th Cir. 1975); *Chastain v. Kelley*, 510 F.2d 1232 (D.C. Cir. 1975); *Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 507 F.2d 1116 (D.C. Cir. 1974); *Menard v. Saxbe*, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974); *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 478 F.2d 938, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38

---

4. *See* Hearings on H.R. 12206 and Related Bills Before a Subcommittee of the House Committee on Government Operations, 93rd Cong., 2d Sess., at 137 (1974); 5 U.S.C. § 1304 (1970) (authorizing FBI security checks for applicants seeking certain types of government employment).

5. The D.C. Circuit has reaffirmed its conclusion that the subject of an arrest file has standing to seek its expungement. *Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 507 F.2d 1116

(1974). That circuit also has discussed the problems concerning the expungement of personnel files. While noting that the effects caused by adverse information contained in a personnel file may be less substantial than the effects caused by the existence of an arrest file, the court, by not discussing the issue, implied that the jobholder had standing to seek expungement of the adverse information. *Chastain v. Kelley*, 510 F.2d 1232 (D.C. Cir. 1975).

L.Ed.2d 125 (1973); *Menard v. Mitchell,* 139 U.S.App.D.C. 113, 430 F.2d 486 (1970). Factors to be weighed in balancing are the accuracy and adverse nature of the information, the availability and scope of dissemination of the records, the legality of the methods by which the information was compiled, the existence of statutes authorizing the compilation and maintenance, and prohibiting the destruction, of the recoreds, and the value of the records to the Government.[6]

■ We believe that the record compiled upon the motion for summary judgment cannot support the district court's order of expungement. The record bears close resemblance to that in *Menard v. Mitchell,* 139 U.S.App.D.C. 113, 430 F.2d 486 (1970) in which the court vacated a summary judgment denying Menard's demand for expungement of his arrest file. The court noted "[t]he very seriousness of the problem underscores the necessity for a clear and complete factual record as a basis for adjudication. . . . The short of the matter is that the facts established on the cross motions for summary judgment were simply inadequate for proper resolution of the complex questions presented." *Id.* at 494–95 (footnotes omitted). Here, the record does not establish the scope and form of dissemination of the Paton file, its utility to the FBI,[7] and the pertinent facts necessary for a determination of the legality of the mail cover. The order of expungement must, therefore, be vacated.

## III. SUMMARY JUDGMENT DENYING PATON OTHER RELIEF

We next consider the district court's dismissal of Paton's claim for damages. Essential to our consideration of whether there was error in the dismissal is a brief analysis of the legal basis of the claim asserted. Although Paton refers amorphously in her complaint to an invasion of her rights under the amendments to the federal constitution as well as Title 18 U.S.C. § 1702, she does specifically rely on the first amendment.[8]

■ The right to bring an action in the federal courts for damages by a plaintiff who asserts a violation of his fourth amendment rights by persons acting under color of federal law is now settled. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Relying on the principle enunciated in *Bivens,* we concluded that *Bivens* was not limited to fourth amendment violations and permitted the recovery of damages in an action instituted in the federal courts for violation of a person's fifth amendment rights. *United States ex rel. Moore v. Koelzer,* 457 F.2d 892 (3d Cir. 1972). We must here consider whether, if the facts adduced at trial establish that Paton's first amendment rights have been infringed, there is a cause of action for damages implied from the Constitution to redress that infringement.

■ While the fourth amendment, considered in *Bivens,* is addressed to the rights of citizens, the first amendment is phrased as a limitation on Congress. That linguistic difference, however, does not compel the conclusion that a private right of action cannot be implied from the first amendment. The converse of a restraint on government power must be that the individual is free to do that which the Government cannot prevent. First amendment rights must be as per-

---

6. We do not now decide the relative importance to be attached to each of the factors.

7. The district court found that the records could be of no future use to the FBI but it is unclear how the court reached its conclusion. The records undoubtedly are of some use to the FBI if only to enable it to determine what actually occurred in the investigation. The records might also prove useful if the FBI decides to evaluate the propriety and utility of mail covers such as this.

8. The pertinent provisions of the first amendment are:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press . . . . .

sonal to an individual as are fourth amendment rights.[9] And, "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests." *Bivens, supra,* 403 U.S. at 395, 91 S.Ct. at 2004.

Nor is the absence of Congressional authorization a controlling factor. *See Bivens, supra,* at 396, 91 S.Ct. 1999. It "would be at least anomalous to conclude that the federal judiciary—while competent to choose among the range of traditional judicial remedies to implement statutory and common-law policies, and even to generate substantive rules governing primary behavior in furtherance of broadly formulated policies articulated by statute or Constitution . . . —is powerless to accord a damages remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will." *Bivens, supra,* at 403–4, 91 S.Ct. at 2008 (Harlan, J., concurring).

Were there no cause of action for federal infringement of first amendment rights, an aggrieved individual could seek damages for violations of his first amendment rights by state officials, 42 U.S.C. § 1983, but not by federal officials. There is no reason to allow federal officials to act with impunity in this context and to bar state officials. The damage to the individual's first amendment interests is the same regardless of the perpetrator of the violation.

Thus, we believe the extension of the *Bivens* rule to violations of first amendment rights to be both justifiable and logical. Under the circumstances of this case, if Paton can prove that her first amendment rights were violated by a federal government employee, such evidence would support a cause of action for damages in the federal courts.[10]

In the instant case, however, the district court found that Paton had not been harmed in such a way as to support a claim for money damages. 382 F.Supp. at 1121. We do not believe that this finding was made appropriately upon a motion for summary judgment.

We previously have discussed the injuries resulting from the existence of Paton's file. In addition, Paton alleges that the mail cover directly invaded, *inter alia,* her first amendment rights. The cover led to an investigation of Paton by an FBI agent. News of the investigation spread through her school,[11] her community,[12] and the country.[13] A factfinder reasonably might conclude that the FBI investigation adversely affected Paton's standing in school and in her community. The possibility of this type of injury is confirmed by the affidavits of three social scientists submitted by Paton in opposition to defendants' motion for summary judgment. These experts submitted opinions on the basis of facts, supplied by Paton's counsel, that Paton had suffered or might suffer in the future the types of injury alleged

9. Also, similar considerations have influenced the historical development and political interpretation of each of these amendments. *See Butler v. United States,* 365 F.Supp. 1035, 1039–40 (D.Hawaii, 1972); Note, 62 Geo.L.J. 1771, 1774 (1974).

10. We therefore do not reach the question of whether she has also an implied right of action under 18 U.S.C. § 1702.

11. Paton testified at deposition that students came up to her in the hall and made remarks about the FBI investigation. The FBI attempts to characterize all the remarks as joking by fellow students, such as the comment, "FBI, get your hands up." Paton testified, however, that other remarks "upset" her and that she was "ostracized." She testified, "I was pointed out. I was not known for myself. I was

known because of such a thing. If people didn't agree with me it was talked about."

12. Plaintiffs' brief refers to an article in a local newpaper about the incident which reported the impressions of two individuals who had worked extensively with the FBI that "it was extremely unlikely for the FBI to have bothered with a 16 year old high school student unless she were involved in something else." Daily Record (Morristown), July 24, 1973.

13. Plaintiffs point to an editorial in the Kansas City Times which noted: "Now, obviously, this sort of conduct cannot be carried on among a person's acquaintances, employees and neighbors without arousing curiosity or suspicion. It is hardly routine to have an FBI agent asking questions about someone you know." Kansas City Times, February 12, 1974.

in her complaint: stigmatization, invasion of privacy, interference with personality development, and interference with her freedom of association through the decision of others to shun her. These affidavits may not have much substantive weight but they may not be disregarded on a motion for summary judgment.

◼ Defendants attack the allegations of injury in several respects. First, they maintain that Paton could not have been injured by the investigation since she was cleared of any wrongdoing. We believe the above recital of evidence presented in the record demonstrates the existence of a factual question and the impossibility of reaching a conclusion as a matter of law.

Defendants also contend that much of the publicity was engendered by the actions of Paton. The record is by no means conclusive but indicates that the news of the investigation first appeared in a school newspaper article apparently instigated by Gabrielson. The incident was discussed both in Gabrielson's classes and in Paton's course, "Left-to-Right." [14] Gabrielson attempted to contact New York newspapers and television stations and, after the lawsuit was filed, both Gabrielson and Paton agreed to interviews from numerous newspaper reporters. It would appear that a factfinder could conclude from this record that the investigation first became publicized through the efforts of Gabrielson. In the absence of any evidence that Gabrielson was acting at Paton's behest, it is unclear why she should be held responsible for the publicity. Similarly, we cannot say as a matter of law that Paton's participation in classroom discussions and newspaper interviews should be viewed as attempts to publicize the incident or rather as mere cooperation with her teachers and the press.

◼ Defendants attack the experts' affidavits as worthless because not based on personal knowledge as required by Federal Rule of Civil Procedure 56(e). The policy behind Rule 56(e) is "to allow the affidavit to contain all evidentiary matters which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." 6 *J. Moore, Federal Practice* ¶ 56.22[1], at 2812 (2d ed. 1974). Opinion testimony that would be admissible at the actual trial may be submitted in an affidavit. *Id.* at 2812–13. The opinions of Paton's experts based on relevant hypothetical facts supplied by her counsel would be admissible at trial if the facts were supported by the evidence. *See* Fed.Rules of Evidence §§ 703–05 (1975). More importantly where, as here, the affidavits are submitted to oppose the grant of summary judgment, opinion evidence is appropriately considered to support the existence of a disputed issue of fact.

◼ Although the Supreme Court has paved the way in *Bivens* for the establishment of a cause of action for damages for infringement of first amendment rights by federal officials, it has not yet had occasion to offer guidance on the types of injuries that are compensable. Because a *Bivens*-type cause of action is the federal counterpart to claims under 42 U.S.C. § 1983, we believe that standards for determining injuries developed in § 1983 litigation are applicable in this context.

◼ In the light of those standards, we believe that Paton's allegations of injury resulting from defendants' activities were not negated as a matter of law by the papers supporting and opposing defendants' motion for summary judgment. The difficulty of quantifying these injuries is no bar to the bringing of a lawsuit for damages. In a suit for an intentional violation of constitutional rights, it has been held in a § 1983 case that "nominal damages are proved by proof of deprivation of a right

14. Gabrielson notified Salkoff, the teacher of "Left-to-Right," of the investigation the afternoon of Devlin's visit to the school. It is unclear when the investigation was discussed in either Salkoff's or Gabrielson's classes.

to which the plaintiff was entitled." *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir. 1965). Compensatory damages may be awarded under certain circumstances although no out-of-pocket expenses are shown. *Seaton v. Sky Realty Co.,* 491 F.2d 634 (7th Cir. 1974); *Donovan v. Reinbold,* 433 F.2d 738, 743 (9th Cir. 1970). Also, punitive damages may be awarded in some situations for a malicious and wanton disregard for a plaintiff's constitutional rights even in the absence of actual damages. *Fisher v. Volz,* 496 F.2d 333, 346–48 (3d Cir. 1974); *Basista v. Weir,* 340 F.2d 74, 87 (3d Cir. 1965). On this abbreviated record, it is not appropriate to decide whether plaintiff Paton could possibly be entitled to damages, and such issues should not be addressed unless and until the district court is faced with a sufficient record on remand. In view of Paton's allegations of injury and the applicable law of damages in civil rights cases, we cannot sustain the district court's entry of summary judgment denying Paton's claim for damages. ·

■■ Defendants attempt to justify the court's entry of summary judgment on other grounds, namely that all their actions were legal and appropriate, and either their immunity or good faith is a defense against a suit for damages. We do not believe that the record allows us to rule on either of these questions.

The legality of the mail cover, the ensuing investigation, and the retention of the file are complex questions which in all probability will depend on the factual context in which they are presented. For example, without deciding the point, the legality of a mail cover resulting in the interception of a person's correspon-

dence with an organization may depend on whether the government has reason to suspect that the organization is engaged in illegal or subversive activities. The record is mute as to why a cover was placed on the Socialist Workers Party other than that it "is the largest Communist Trotskyist organization in the United States." [15] As another example, the legality of a mail cover might turn on whether the letters were ˙ opened. The record, as it now stands, does not demonstrate conclusively that Paton's letter was not opened. [16] The inadequacy of the record bars a resolution of the complex constitutional questions presented. *See Socialist Labor Party v. Gilligan,* 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); *Oldroyd v. Kugler,* 461 F.2d 535, 540 n. 11 (3d Cir. 1972). The district court must decide, on the evidence adduced on remand, whether and which of Paton's rights were violated.

The question of defendants' immunity or good faith defense against a suit for money damages also may turn on factual determinations such as the type of discretion exercised and the defendants' good or bad faith. We again look for guidance to § 1983 cases. *See O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 134 (1974); *Fidtler v. Rundle,* 497 F.2d 794 (3d Cir. 1974). Again the facts have not been developed on the record as to these questions. We do not decide the merits of these issues. However, we conclude that the district court's order of summary judgment cannot be sustained on any of the suggested grounds at this

---

**15.** A letter from the Department of Justice to the Assistant Postmaster General enigmatically notes that the Socialist Workers Party "has been designated by the Attorney General pursuant to Executive Order 10450." This executive order, printed at 5 U.S.C.A. § 7311, p. 306, deals with security requirements for government employees.

**16.** Defendants, supported by the deposition testimony of the mail foreman, contend that

the mail cover consisted only of copying information appearing on the exterior of envelopes. Paton responds, however, that if Chief of Police Strait did not inform Agent Devlin that Paton was a student at West Morris Mendham High School, as Strait testified that he did not, then a factfinder reasonably could infer that Devlin ascertained the whereabouts of Paton from the contents of the letter.

time. The order must be vacated and remanded for further proceedings.

■ The foregoing discussion demonstrates that Paton has standing to challenge the constitutionality of Postal Regulation 861.4 authorizing the Postal Inspector to order mail covers requested by any law enforcement agency to protect the national security, the FBI's field investigation program, and the maintenance of files on those investigated for engaging in subversive activities. Paton has standing to challenge the constitutionality of these programs since she may have sustained or be immediately in danger of sustaining a direct injury as a result of all the programs. *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937). Our holding that Paton has standing in no way indicates that Paton if successful on the merits will be entitled to the broad injunctive and declaratory relief she requests. The scope of such relief will depend on the factual and legal background of the district court's decision and is largely within the discretion of that court. *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

## IV. GABRIELSON'S STANDING TO SUE

■ This suit was instituted by Paton and by William Gabrielson, chairman of West Morris Mendham High School's Social Studies Department. As a co-plaintiff, Gabrielson also must have standing to sue. Although Gabrielson's allegations of injury might be sufficient to confer standing, we believe the record on summary judgment establishes that he has not suffered the requisite injury.

Gabrielson's key allegation in the complaint is that defendants' activities infringed his right of academic freedom, i. e., his ability to teach.[17] Since, however, he only designed but did not teach the course, "Left-to-Right," and in no way was responsible for Paton's mailing of her letter, it is difficult to determine how he was directly injured by defendants' activities. He admitted at deposition that defendants' activities had not caused him to direct any social studies classes to refrain from seeking any information about any group or had caused the school to discontinue any educational activities.[18]

The only direct injury to which Gabrielson can point is that the course experienced a 50 percent drop in enrollment the school year after the incident. He did not know, however, of any general concern among the students about enrolling in the course and could not attribute the decrease in enrollment to the actions of defendants, except to say that it "seems likely that those actions had some effect." Thus, a causal connection between defendants' activities and the drop in enrollment has not been demonstrated. *See Warth v. Seldin,* 422 U.S. 490, 505–507, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Even if the record indicated that defendants' activities caused the decrease in enrollment, there is no explanation of how the drop in enrollment harmed Gabrielson. His brief argues that the decrease deprived

---

**17.** The complaint also alleged that defendants infringed plaintiffs' rights to engage in free political inquiry and to seek information from dissident political groups. Gabrielson admitted at deposition, however, that defendants' activities had not deterred him from seeking information from political groups and others had not been deterred from freely associating with him.

Similarly, the complaint alleged that defendants were maintaining a file on plaintiffs and had violated their right of privacy. Gabrielson admitted in his answers to defendants' inter-

rogatories that these allegations did not apply to him. He testified at deposition that defendants' activities violated not his "personal privacy" but his "professional privacy." We interpret this reference to "professional privacy" as meaning interference with his right of academic freedom.

**18.** Frank Salkoff, the teacher of "Left-to-Right," continued his policy of having the students write to political parties, but requested that they use the school's, not their own, name and address.

him of "economic opportunity" but we fail to perceive how Gabrielson is economically harmed by a drop in enrollment in a public school course he does not teach.

The only "injury" Gabrielson can attribute to the actions of defendants may be summarized by his statement that

> the investigation conducted by the Federal Bureau of Investigation was seen by me as an inhibiting force upon me in my position so that I would be less likely to put students in potential jeopardy. So I hold, because of the actions of the FBI, my role in assisting students in an open spirit of inquiry has been restricted.

This allegation of injury is insufficient to confer standing. In *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), plaintiffs alleged that the existence of an Army system of surveillance and compilation of information about lawful dissident groups exercised "a *present inhibiting effect* on their full expression and utilization of their First Amendment rights." *Id.* at 10, 92 S.Ct. at 2324, quoting 144 U.S.App.D.C. 72, 444 F.2d 947, 954 (1971). Plaintiff, however, could not point to any specific harm. The Court held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." 408 U.S. at 13–14, 92 S.Ct. at 2325. We believe that Gabrielson's only allegation of harm supported by the record is his allegation that defendants' activities constituted an "inhibiting force." *Laird* demonstrates that this allegation does not constitute a cognizable legal injury.

■ Gabrielson also contends that he has standing to represent the rights of the teacher [19] and students of the course and the rights of the school. In general, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Sel-*

*din*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). Assuming that Salkoff, the students in "Left-to-Right," or the school would have standing, we do not believe that Gabrielson may take advantage of any of the exceptions to the general rule. To assert the rights of third persons, Gabrielson himself must have suffered injury. *See Warth v. Seldin, supra,* 422 U.S. at 500–502, 95 S.Ct. 2197; *Barrows v. Jackson, supra,* 346 U.S. at 255, 73 S.Ct. 1031; *Tileston v. Ullman, supra*; Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423, 428–31 (1974).

■ Similarly, Gabrielson claims that he has standing under the less restrictive rules used in first amendment cases. Gabrielson apparently is referring to the overbreadth doctrine which permits a plaintiff to assert the constitutional rights of hypothetical third parties to whom the challenged law and practice conceivably could apply. *See Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Again, however, the individual must claim harm or threat of specific future harm and not merely a subjective chill. *Id.* at 816–817, 95 S.Ct. 2222.

Gabrielson has not suffered more than a subjective chill of his constitutional rights. We therefore conclude that he lacks standing to bring this lawsuit.

## V. PROCEDURAL MATTERS

Plaintiffs sought to bring their causes of action seeking declaratory and injunctive relief as a class action on behalf of "all persons who have been or will become engaged in correspondence with dissident political groups . . . in pursuance of their rights under the United States Constitution; and whose correspondence is surveilled by defendants . . . without authority pursuant to

---

19. Salkoff testified at deposition that he was fearful that inquiry into lawful political groups could result in investigation of him or of his students.

a valid search warrant; and who thereby become subjects of files . . . maintained by the defendants . . . ." After defendants objected that the term "dissident" was "amorphous," plaintiffs redefined their proposed class to include all persons in correspondence with "political groups." The district court refused to certify the class on the ground that plaintiffs did not satisfy the typicality requirement of Federal Rule of Civil Procedure 23(a)(3).

The scope of review of an order denying or granting a motion to maintain a class is narrow. If the district court properly applies the relevant criteria, we may reverse its order only for an abuse of discretion. *See Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 245 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the proposed class. As we have noted, the determination of the constitutionality of mail covers and the maintenance of any resulting files in large part may turn on factual determination. Paton's interest in the Socialist Workers Party was academic and her investigation by the FBI quickly was terminated. We believe that the district court did not abuse its discretion in concluding that Paton's claims are atypical of the claims of persons who may have had close affiliation with the Socialist Workers Party or persons who may have had illegal or suspicious activities uncovered as a result of the mail cover.

Plaintiffs sought to amend their complaint to add two additional causes of action and to name additional parties as defendants. The district court, in light of the conclusion that plaintiffs had suffered no injury resulting from defendants' actions, found it unnecessary to rule on plaintiffs' motion, thereby effectively denying it.

Our vacation of the district court's order necessitates consideration of plaintiffs' motion to amend. A grant of leave to amend a complaint largely is within the discretion of the district court. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). We therefore decline to decide on appeal whether plaintiffs' motion to amend their complaint should be granted, but remand the question to the district court for decision in the light of this opinion. Such decision should be rendered in accordance with the federal policy that, absent resultant prejudice to the opposing party or similar reasons, leave to amend a complaint freely should be granted. Fed.R.Civ.P. 15(a); *Zenith Radio Corp. v. Hazeltine Research Inc., supra,* 401 U.S. at 330–31, 91 S.Ct. 795, *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Our vacation of the district court's entry of summary judgment against Paton also will necessitate rulings on plaintiffs' motions to compel defendants to comply with plaintiffs' discovery requests and undoubtedly will result in additional discovery proceedings. We decline plaintiffs' invitation to set out guidelines for the district court to follow in ruling upon any discovery motions. We are confident that the court will have little difficulty in deciding any discovery motion in accordance with the Federal Rules of Civil Procedure and the relevant case law.

## VI. CONCLUSION

The fundament of our decision is the principle that the district court may not resolve conflicting factual contentions upon a motion for summary judgment. Many, if not all, of the parties' factual and legal contentions will be critical in future proceedings of this lawsuit. Our decision in no way anticipates the weight that these contentions should be given by the district court upon remand.

The judgment of the district court will be vacated and the case remanded for further proceedings consistent with this opinion.